IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Jeffery L. Howard, | Case No. 3:17 CV 1180 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Management and Training Corp., et al., | |
| Defendants. | |

## INTRODUCTION

Defendants Ed Goodwin, Becky Joyce, Lorri Shuler, Blaire Smith, Neil Turner, and Management and Training Corporation (collectively "Defendants") move for summary judgment (Doc. 38). Plaintiff *pro se* Jeffery Howard, despite making no fewer than fourteen filings since Defendants moved for summary judgment, has not filed an opposition.

## BACKGROUND

Jeffery Howard is an inmate at the North Central Correctional Complex, a privately operated prison under the control of Management and Training Corporation. Howard sued the Corporation as well as several prison staff members, alleging three types of claims: (1) Equal Protection and Establishment Clause claims related to race-based and religion-based denial of training on the prison chapel's audio equipment; (2) an Eighth Amendment claim related to insufficient prison-issued footwear; and (3) a First Amendment claim related to denial of access to the courts.

**Equal Protection and Establishment Clause Claims**

Howard alleges that only white, Christian inmates are allowed to access, train on, and operate the audio equipment in the prison chapel (Doc. 1-4 at 4). The chapel holds services for various religions, and Defendants Blaire Smith and Ed Goodwin work as prison chaplains for its Christian services. The chaplains manage a group of inmate volunteers called lay ministers who fill roles such as choir, band, candle bearer, usher, and sound technician (Doc. 38-2 at 13).

But one does not simply self-anoint as a lay minister. Aspiring ministers must first fill out an application (*see id.*). Then they must attend six religious classes -- one per week for six weeks. Then, depending upon which position has an opening available, they can start training and working in the position of their choice. Certain positions require lay ministers to meet "safety and security standards that would permit them access to areas of N.C.C.C. that are off limits to all other inmates" (*id.* at 6). The sound tech position, in particular, requires inmate volunteers to access electronics equipment ordinarily sealed behind locked doors (Doc. 38-1 at 6).

At North Central, levels of security risk are defined numerically. Those prisoners with low security risk have negative numbers and those with high risk have positive numbers (*id.*). The highest risk level a prisoner can have without being subject to solitary confinement is a level-two. Howard is a level-two security risk (*id.*).

Despite his high security risk, Howard submitted his application for a lay minister, was accepted, and started attending the weekly classes in July 2013 (Doc. 1-2 at 3). He attended these classes not for religious reasons, but rather so that he could become a sound tech and learn to use the chapel's soundboard mixer, which he thought would be a valuable skill (Doc. 38-1 at 7). Howard identifies his religion as non-Christian deist and his race as black (*id.*). He does not allege his religion or race ever prevented him from attending classes or events (*id.*).

After Howard attended six ministry classes, he was told there were already four inmates working as sound techs and no further volunteers were needed for that position (Doc. 1-2 at 4). But he was also told he could observe the current sound techs and he would be added to the waitlist for that position. Not happy with this news, Howard complained to Chaplain Blaire Smith. Smith wrote back, telling Howard that the "core" of the ministry "is to serve," and "if you are a productive lay minister for the duration needed for an opening on soundboard to happen, then you may have a chance to run it" (Doc. 38-2 at 23).

Howard then stopped attending ministry events. In November 2013, the chaplains discharged him from the ministry due to lack of attendance (*id.* at 17). Howard filed a grievance about this termination, but that grievance was denied in December 2013 (Doc. 38-1 at 33). Defendants admit that from 2012 to 2017, the inmates who held the four sound tech positions were white (Doc. 38-2 at 3); and within the past year, a black inmate became a sound tech (Doc. 38-1 at 9).

**Eighth Amendment Claim**

Howard claims Defendants subjected him to cruel and unusual punishment by providing footwear that exacerbated his osteoarthritis (Doc. 1-4 at 10). He alleges that, in the wintertime, his feet ache and are "cold all the time" (Doc. 38-1 at 17). The prison outfits its inmates with breathable mesh shoes, similar to tennis shoes (*see* Doc. 38-2 at 4). Howard claims the prison should have provided him with boots instead (Doc. 1-4 at 10).

For at least the past two years, Howard has been a regular patient with the prison podiatrist, Dr. Tabbert (Doc. 38-1 at 17). Dr. Tabbert diagnosed Howard with osteoarthritis in his left big toe (*see id.* at 17–18). Dr. Tabbert did not prescribe special boots or shoes; but rather, fitted Howard with orthotics for his standard prison shoes (*id.* at 17). Howard does not suggest he was ever denied podiatric treatment; in fact, he says he has been seeing Dr. Tabbert "on a consistent basis" (*id.* at 18).

3

Howard admits his goal is not medical treatment for his osteoarthritis, rather, he wants "some good boots for [his] feet" (*id.*).

**First Amendment Claim**

Howard alleges Defendants denied him access to the courts by thwarting his attempts to exhaust his administrative remedies through the prison grievance process. Under the Prison Litigation Reform Act, a prisoner may not bring an action under federal law related to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In Ohio, a prisoner exhausts his administrative remedies by proceeding through the three-step grievance process outlined in Ohio Administrative Code § 5120-9-31(K). That three-step process involves: (1) "[t]he filing of an informal complaint," (2) "[t]he filing of the notification of grievance," and (3) "[t]he filing of an appeal of the disposition of grievance." Ohio Admin. Code § 5120-9-31(K).

Howard claims Defendants impeded him from completing the second step of this process as to his footwear complaint (Doc. 38-1 at 16). Specifically, he alleges the prison inspector, Lorri Shuler, ignored his requests for a notification of grievance form (*id.*; Doc. 1-4 at 8–9). He claims he "has not been able to exhaust his administrative remedies" because "his attempts to get the Notification of Grievance form . . . ha[ve] gone unanswered" (Doc. 1-4 at 9). Defendants, for their part, have not moved to dismiss any claims in this lawsuit on the basis of failure to exhaust administrative remedies.

**STANDARD OF REVIEW**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact," such that the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When evaluating a motion for summary judgment, this Court must view the facts in the light most

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court does not weigh the evidence or determine the truth of any matter in dispute; rather, it evaluates only whether the record contains sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

"[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). This Court "cannot grant summary judgment in favor of a movant simply because the adverse party has not responded," for the moving party "always bears the burden of demonstrating the absence of a genuine issue as to a material fact." *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998) (citation omitted). But this Court is not obligated to "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992). Rather, this Court "may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Id.*

## DISCUSSION

### Equal Protection and Establishment Clause Claims

Howard brings his Equal Protection and Establishment Clause claims under 42 U.S.C. § 1983. A successful Section 1983 claim requires evidence of "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). Additionally, a Section 1983 plaintiff must bring the claim within the timeframe allowed by the applicable statute of limitations. In Ohio, the two-year limitations period of Ohio Revised Code (ORC) Section 2305.10 governs

5

Section 1983 actions. *Browning v. Pendleton*, 869 F.2d 989, 990 (6th Cir. 1989). ORC 2305.10 is "a general statute which requires that actions for bodily injury be filed within two years after their accrual." *Id.* Under that statute, a cause of action "accrues . . . when the injury or loss to person or property occurs."

Here, Howard quit the lay ministry in November 2013 (Doc. 38-1 at 10–11). He filed a grievance, which was denied on December 10, 2013 (Doc. 38-1 at 33). Thus, at the latest, his claims accrued in December 2013, meaning he had until December 10, 2015 to file this lawsuit. Howard did not file his Complaint until April 19, 2017 (Doc. 1-4 at 3), more than a year after the limitations period expired. Howard's Equal Protection and Establishment Clause claims are clearly time-barred.

Even if these claims were not barred, they would not survive summary judgment on their merits. Howard first alleges the rules governing the sound tech position violated the Equal Protection Clause because they were racially discriminatory. But "[t]he Equal Protection Clause forbids only intentional discrimination." *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994). Where there is evidence that facially neutral rules caused a discriminatory impact, a plaintiff must show that the discrimination was purposeful -- that is, the defendant used rules "'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

Here, there is no evidence of purposeful discrimination. The rules require sound tech applicants to regularly attend services and classes (Doc. 38-2 at 13–14); they require applicants to meet "safety and security standards that would permit them access to areas of N.C.C.C. that are off limits to other inmates" (*id.* at 6); and they allow for only four sound techs at any one time (*id.* at 26). These rules are facially neutral in terms of both race and religion. Although there is some evidence of racially discriminatory impact -- since only white inmates were sound techs between 2012 and

2017 (*id.* at 3) -- discriminatory impact alone is not enough. There is no evidence that Defendants continued using these rules "because of" their adverse effects on black inmates. *Feeney*, 442 U.S. at 279. Indeed, Howard admits that, within the past year, a black inmate became a sound tech (Doc. 38-1 at 9).

Further, there is no evidence that Howard's religious identity as a non-Christian deist played any role here. Howard admits his religious identity "did not present a barrier" to participating in the lay ministry (Doc. 38-1 at 7). Howard could have remained a lay minister and waited for a vacancy, but instead he decided to quit and remove himself from the waitlist. There is no evidence of purposeful discrimination.

As for the Establishment Clause, Howard alleges he had to attend Christian religious events to be trained on the chapel soundboard (Doc. 1-4 at 5–6). Given the statute-of-limitations bar, this Court need not address the merits of this claim at-length under the *Lemon* test. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971). This Court notes only that the Establishment Clause "guarantees that government may not coerce anyone to support or participate in religion or its exercise," *Lee v. Weisman*, 505 U.S. 577, 587 (1992), and that Howard's case is different from those finding coercion. *See, e.g.*, *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996) (finding coercion where prisoners had to participate in a religiously based, drug-addiction-treatment program or face denial of parole); *Nusbaum v. Terrangi*, 210 F. Supp. 2d 784, 789 (E.D. Va. 2002) (finding coercion where inmates had to attend a religious program or lose their good-time credits); *Young v. Chuvalas*, 2018 WL 3008492, at *6 (S.D. Ohio 2018) (finding coercion where prisoners had to attend a mandatory religious event or face punishment).

Howard voluntarily chose to participate in an optional program. *Cf. Henderson v. Frank*, 190 F. App'x 507, 509–510 (7th Cir. 2006) (holding that religious television programming did not violate

7

the Establishment Clause because "inmates could change the channel or turn off their televisions at any time"). He sought a benefit of lay ministry participation, and when he decided that benefit was no longer worth his time, he quit. He does not allege he was ever threatened with punishment or otherwise coerced into attending these optional religious events. His desire to be trained was purely for his own enjoyment -- not for any religious purpose. And he admits the sound tech position was neither a general education course nor a paid job, but rather a volunteer position (Doc. 38-1 at 15).

**Eighth Amendment Claim**

Howard argues he suffered cruel and unusual punishment in violation of the Eighth Amendment when Defendants issued him standard prison shoes instead of boots. The test for whether prison conditions amount to cruel and unusual punishment has two prongs -- one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the pain inflicted was so serious that it violated "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective prong asks whether a defendant acted with "deliberate indifference" to an inmate's health or safety. *Farmer*, 511 U.S. at 834.

Under the objective prong, a violation of contemporary standards of decency requires harm that is "sufficiently serious." *Id.* (citation omitted). A plaintiff must show evidence of an "extreme deprivation[] . . . denying the minimal civilized measure of life's necessities." *Hudson*, 503 U.S. at 9 (internal quotations and citation omitted). This standard requires a showing of harm greater than mild discomfort, because "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Id.* (internal quotations and citation omitted). Indeed, the Eighth Amendment "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

A prison's failure to provide adequate winter clothing can violate contemporary standards of decency, as exposure to winter weather "without adequate clothing can obviously inflict pain." *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992). But successful "Eighth Amendment claims related to cold exposure" typically require evidence that prisoners were exposed to "extremely cold temperatures for long periods of time" and had "no other means of warming themselves." *Rhoden v. Bundren*, 2008 WL 747589, at *2 (S.D. Ill. 2008). For instance, the Seventh Circuit in *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009), found that an inmate who "was never issued certain clothing items [and] . . . suffered from hurt ears and numb hands, felt frostbite, and caught colds" did not prove "objectively serious harm" because he "did not show that he was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter."

Here, the record is absent evidence of harm sufficient to violate contemporary standards of decency. At most, the record contains evidence of mild discomfort. Howard does not allege he was ever subjected to severe cold for long periods of time; rather that "some good boots for [his] feet" would make him more comfortable (Doc. 38-1 at 18).

Further, under the subjective prong, the record contains no evidence of deliberate indifference to Howard's health or safety. Prison officials act with deliberate indifference when they consciously disregard a substantial risk of harm to an inmate. *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010). Howard admits he was able to see Dr. Tabbert regularly for his foot pain. Dr. Tabbert treated that pain by fitting Howard with orthotics for his prison shoes. There is no evidence that Dr. Tabbert ever prescribed boots as medical treatment or that boots were medically necessary. Howard does not allege denial of podiatric treatment, and he does not name Dr. Tabbert as a defendant in this lawsuit. There simply is no genuine dispute of material fact.

**First Amendment Claim**

Howard alleges Defendants denied him access to the courts by preventing him from exhausting his administrative remedies for his footwear complaint (Doc. 1-4 at 8–9; Doc. 38-1 at 16). Inmates have a constitutional right of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996). An alleged violation of this right, however, "cannot ground a Section 1983 claim without a showing of 'actual injury.'" *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

Although the Prison Litigation Reform Act requires prisoners to exhaust their administrative remedies before bringing a prison-conditions lawsuit, inmates "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). This is because a prisoner's "failure to exhaust is an affirmative defense," meaning it is the defendant's choice whether to raise it. *Id.*

Here, Howard was able to file his Complaint, Defendants never raised the exhaustion defense against him, and this Court reached the merits of his footwear claim. Howard was never denied access to the courts, and he cannot show any actual injury to sustain his First Amendment claim.

## CONCLUSION

The Motion for Summary Judgment (Doc. 38) is granted as to all Counts; the case is dismissed. All other pending Motions (Docs. 33, 35–36, 44–47, 54–56) are therefore denied as moot.

IT IS SO ORDERED.

                                                  s/ *Jack Zouhary*
                                                  JACK ZOUHARY
                                                  U. S. DISTRICT JUDGE

                                                  November 7, 2018